**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CHRISTOPHER HILL, | : | |
| Plaintiff, | : | |
| | | Case No. 3:08cv00190 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

Plaintiff Christopher Hill has attempted several times to convince the Social Security Administration that he is under a disability and is therefore eligible to receive Disability Insurance Benefits (DIB).  Each attempt failed and each failure led Plaintiff to file a case in this Court challenging the Social Security Administration's non-disability determination. The present case – the third of his challenges – seeks judicial review of Administrative Law Judge Daniel R. Shell's decision in April 2008 concluding that Plaintiff's was not under a "disability" within the meaning of the Social Security Act. Based on that non-disability determination, ALJ Shell denied Plaintiff's DIB application. (Tr. 707-732).

There is no dispute in the present case that this Court has jurisdiction to review the ALJ Shell's April 2008 decision.  *See* 42 U.S.C. §405(g).

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Commissioner's Memorandum in Opposition (Doc. #14), Plaintiff's Reply (Doc. #15), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding this case to the Social Security Administration for payment of benefits or, at a minimum, a remand to correct certain errors.

The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

### A. <u>Plaintiff and The Hearing Testimony</u>

**1.**

Plaintiff asserted in his DIB application that he was under a disability beginning on June 12, 2000. (Tr. 101). He met certain financial requirements for obtaining DIB until December 31, 2005. (Tr. 109, 724). Thus, the overarching issue Plaintiff presented to the Social Security Administration was whether he was under a "disability" within the meaning of the Social Security Act during a closed period of time – beginning on June 12, 2000 and through December 31, 2005. Plaintiff contends that he was under a disability during this closed period of time due to severe back pain and depression.

Plaintiff worked for nearly 19 years as a shipping inventory and paper converting manager at the Dayton Blueprint Company. (Tr. 41-42, 120).

In September 1998, about two years before his claimed disability onset date, Plaintiff underwent back surgery. He took off work for four months, until January 1999. Although he continued to work for about five months, his back pain became too severe, and he stopped working on June 12, 2000. (Tr. 119).

**2.**

During Plaintiff's first administrative hearing in February 2002, he testified that his back pain radiated into his legs and feet. (Tr. 47). He describes his pain as a sharp, throbbing pain that never really goes away. *Id*. He estimated that when his pain was at its worst level, it was a "10" on a 0 to 10 pain scale. Plaintiff explained "it's got me to where I'm sobbing and things like that and I can get it down to a seven or eight probably

with my medication and not doing anything to really cause anything to bring it on." *Id.*

The most comfortable position for Plaintiff was lying on his side. He estimated that he could walk about a city block before needing to sit down and could stand or sit for 10 minutes each. (Tr. 48-49). He could lift 5 or 10 pounds at most. He did not help with the housework and was "pretty much a homebody." (Tr. 50).

During a typical day, Plaintiff's wife helped him get out of bed. He would then lay on the couch and his wife would bring him his medication. After a while, he would get up, but he did very little during the day. Mainly he just sat or lay down trying "to find a position to keep a lot of the pain down some." (Tr. 51). He testified, "My life ... is basically on the side – laying on my side on the couch." (Tr. 52). He estimated that if he added up all the time during an eight-hour day he could be standing or walking, he would be lucky to get 2 hours total. (Tr. 57).

Plaintiff also testified that he has no ability to concentrate at all, because "[i]t's hard to concentrate when you've got driving pain all the time." (Tr. 60). The pain also caused Plaintiff to struggle with depression, for which takes prescription medication (e.g., Paxil or Celexa). (Tr. 43, 46, 61).

Upon Plaintiff's challenge to the ALJ's subsequent non-disability decision, this Court remanded the matter to the Social Security Administration due to certain errors in the ALJ's assessment of Plaintiff's credibility. (Tr. 446-71).

**3.**

On remand ALJ Shell held two supplemental hearings. During the first supplemental hearing (in December 2003), Plaintiff was asked why he could no longer work. He answered:

> Because I'm in so much pain that it's just driving me nuts. I tried to, I tried to go back to work. I actually was there from January of '99 to June of 2000 but in that period of time I missed so much work and it was causing me so much grief that it just mentally just tore me down to the point where I, I couldn't do it anymore. I just couldn't do it anymore.

(Tr. 875). He explained that the back surgery he underwent was needed to treat herniated discs and some sciatic nerve problems. *Id.* Plaintiff testified that when he returned to work after, it was only part time because he experienced an unexpected amount of back pain. (Tr. 880). The surgery did not provide him very much relief. (Tr. 882).

Plaintiff took prescription medication to treat his pain, including Oxycontin or Vicodin. (Tr. 885). Without the pain medication, his pain level would be 10, on the 0 to 10 pain scale. (Tr. 886). With pain medication, his pain level would be 8. *Id.* When asked to describe his pain, he answered:

> In some ways it's hard to describe because it's electrical. I feel really sharp, sharp pains in my back and then my legs will get completely numb and my calves will burn real bad like somebody's got a match on them –

(Tr. 886). He also felt pain going down both legs all the way to his toes. *Id.* And he noted, "It's completely, it's completely taken over my life. I have no life. It's just all my waking day is trying my best to stay out of that number 10 pain." (Tr. 886-87). Plaintiff also testified that since applying for DIB, "[i]t's been three years of just solid straight pain." (Tr. 887). He continued to suffer from depression and he noted that he had been hospitalized in March 2002 because of depression with suicidal thoughts. (Tr. 894).

Plaintiff testified that his typical day was spent laying on the couch, and he did not help with housework. He could no longer play golf or other sports. (Tr. 889-90).

Plaintiff was hospitalized in August 2003 for emergency gall bladder surgery. During that time, he was diagnosed with diabetes. (Tr. 891-92).

ALJ Shell held another supplemental hearing (in October 2004). When asked to describe his pain, Plaintiff testified, "It throbs, it burns, it's numb. Like somebody took a baseball bat to my back or something." (Tr. 838-39). Plaintiff received mental health counseling until his insurance expired at the beginning of 2003. (Tr. 839). He explained that he needed such treatment "[b]ecause the full situation's got me completely broke down. I'm having a hard time dealing with this pain and not being able to get out of pain

and going different places and having different things done and nobody seems to be able to help me." (Tr. 839-40). He felt completely helpless and hopeless about his situation, stating, "I don't have any life at all, my wife has to do everything for me. I have to beg and borrow from neighbors, family and things like that. It's just completely taken my pride away from myself." (Tr. 840).

Plaintiff was limited to standing or walking 5 to 10 minutes in a 1-hour period, and sitting for 15 minutes in a 1-hour period. (Tr. 841). During an 8-hour day, he could stand or walk a total fo 2 hours. He could lift no more than 10 pounds. *Id*.

He spends a typical day watching television or reading a little. His goal is "just try to stay out of pain as much as [he] can." (Tr. 843).

A medical expert, Richard Hutson, M.D., also testified during this supplemental hearing. Dr. Hutson explained his review of the record and opined that Plaintiff's degenerative disc disease in the lumbar spine partially, but not fully, met the criteria for Listing 1.04 and retained the Residual Functional Capacity to perform sedentary work – defined, in part, as lifting no more than 10 pounds at a time, 20 C.F.R. §404.1567(a) – with certain limitations.[2] (Tr. 851-52). Dr. Hutson noted:

> I think he'd have to have a sit/stand option, maybe 5 minutes every hour not to leave the work station. Five minutes would not have to be consecutive. I would avoid repetitive twisting. If he has to do any bending forward as you would attempt to lift something, he can lock his lower back into extension, which is what we do when we lean backwards. You can safely bend forward just at the hips to about 45 degrees, and then go back up straight.

> I would avoid concentrated exposure of cold, heat, wetness, humidity, vibration and heights or hazardous areas. Obviously with sedentary work, there would be no ladders, ropes or scaffolding. He could do ramps or stairs occasionally....

---

[2] The significance of the Commissioner's Listings and the phrase "Residual Functional Capacity" is explained below, *infra*, §III.

(Tr. 851-52).

Upon Plaintiff's challenge to ALJ Shell's subsequent non-disability decision, this Court remanded the matter to the Social Security Administration due to errors in (1) the ALJ's rejection of opinions provided by Plaintiff's treating physician, Dr. Keyes, and a one-time examiner, Dr. O'Connell; (2) the ALJ's acceptance of opinions provided by a non-treating physician, Dr. Hutson; and (3) the ALJ's decision, at Step 2 of the sequential evaluation, that Plaintiff had not been under a severe mental impairment for at least 12 months.  (Tr. 737-59).

**4.**

ALJ Shell held another supplemental hearing in March 2008.  Four years had gone by since his prior supplemental hearing, since which, according to Plaintiff, his back pain had worsened.  (Tr. 819).  Plaintiff testified, "[W]hatever I try to do whether it's try to walk or anything like that I can't – I just don't seem to be able to make myself get any better...  [T]hrough medication and trying to do different things I just – I don't know what to do...."   (Tr. 819-20).  His explained that his back pain was mainly on the lower right side, radiating mainly into his right leg with numbness or tingling in his toes most of the time.  (Tr. 820).  Plaintiff used a cane when he left his house, especially to help him avoid stumbling.  (Tr. 821-22).

Plaitniff testified that he could be on his feet, standing or walking, for 10 to 15 minutes before needing to take a break.  (Tr. 822).  He could lift 10 pounds, maybe.  *Id*.

Plaintiff spent a typical day laying on his side on the couch with a heating pad.  *Id*. Plaintiff testified that his back pain was always present and that his "life now is just trying to control the pain...."  (Tr. 824).  He also continued to suffer from depression because he could hardly accomplish anything he wants to accomplish.  *Id*.  It makes him feel "terrible" that his wife has to work all day, then do all the work around their home when gets home.  (Tr. 824-25).  Plaintiff has trouble concentrating.  He tries to talk himself out of being depressed but "just can't get out of it...."  (Tr. 826).  He experiences crying spells

2 to 3 times per week, and he has suicidal thoughts a few times a week. *Id.*

**B.** **Additional Evidence**

During the time period at issue in Plaintiff's DIB application, Plaintiff was younger than age 50. He is consequently considered to be a "younger person" for purposes of resolving his DIB application. *See* Tr. 730; *see also* 20 C.F.R. §404.1563(c). Plaintiff graduated from high school and completed two years of college.

The administrative record in this case is lengthy mainly due to the existence of many medical records. Plaintiff has summarized in detail the medical records in the case (Doc. #8 at 7-15). Upon the Court's consideration of the entire administrative record, there is no need to repeat in detail or greatly expand upon Plaintiff's summary except to note that the pertinent medical source opinions were provided by Plaintiff's treating physician, Dr. Keyes (Tr. 216, 219-23; 262-72, 519-24, 674); a one-time examiner, Dr. O'Connell (Tr. 508-12); a one-time examiner, Dr. Vitols (Tr. 324-33); a one-time examiner, Dr. Wunder (Tr. 655-67); and a non-examining physician, Dr. Hutson, who testified during the ALJ's supplemental hearing in October 2004 (Tr. 848-60).

The Court's earlier description of Dr. Keyes' opinions is incorporated herein by reference. (Tr. 455-60). It suffices to add that in Dr. Keyes' opinions, Plaintiff was restricted to less than sedentary work. *See* Tr. 458-60 (and records discussed therein).

Dr. Vitols' January 2002 opinion is significant because he described in detail his own findings and observations based upon his examination of Plaintiff. These included the following:

> The dorsolumbar spine reveals severe spasm to palpation right and left. Both sacroiliac joints are exquisitely tender to palpation as is the midline from L3-L5 spinous processes. There is a well-healed scar from previous surgery which is very tender to palpation. Claimant is not able to stand in a fully erect position. He flexed at 15 degrees. Further flexion is possible only to 30 to 35 degrees. Left lateral flexion is to 10 degrees. Right lateral flexion is to 10 degrees. Claimant has no ability to perform heel and toe walking.

(Tr. 331).  Dr. Vitols also explained that he reviewed several "Radiological Diagnostic Tests: including, but not limited to, a post-surgical MRI of Plaintiff's lumbar spine performed in October 2000, which identified "degenerative disc desiccation at the L4-5 level with central canal stenosis.  L5-S1 reveals a moderate disc bulge with facet hypertrophy."  (Tr. 333).  Dr. Vitols opined in part:

> The combination of a major depressive disorder and the need for daily narcotics for pain as well as the inability of the claimant to sit, stand or walk but for a few minutes at a time as well as in association with the arthritic and degenerative changes that have been identified in this report render this claimant totally and permanently disabled for any gainful employment.

(Tr. 333).

In September 2003 Dr. O'Connell examined Plaintiff, reviewed his medical records, and concluded that he was unable to perform the full range of sedentary work. She noted, in part, that Plaintiff could not stand/walk more than 2 hours per day or sit for more than 3 hours per day.  (Tr. 509, 512).  Dr. O'Connell based her opinions on a detailed report, which partly stated:

> Medical records ... covering service 10/27/1999 through 09/19/2000. For postlaminectomy syndrome he was treated with facet injections, S1 joint injections, and L5-S1 epidural blocks.  Unfortunately, he did not have long-term relief with these injections, and they ordered a repeat MRI. Lumbar spine MRI of 10/27/2000 was compared to the previous MRI, showing degenerative disc disease at L4-L5 and L5-S1.  Endplate spurring was noted L5-S1, and facet arthropathy noted L4-L5 and L5-S1.  The was a diffuse annular disc bulge at L4-L5 and at L5-S1.

(Tr. 514).  Dr. O'Connell continued:

> Medical records from Dr. Raymond Poelstra covering dates of service 08/30/2001 through 09/24/2001.  The patient was seen for postlaminectomy syndrome of the lumbar spine.  There was a new MRI done of 09/05/2001 which showed granulation tissue with scar formation at L4-L5 and facet hypertrophy with foraminal narrowing.  L5-S1 showed granulation tissue and scarring at the S1 nerve root sleeve.  There was a mild disc bulge and endplate spurring noted.  Neural foramina are

moderately stenotic....

(Tr. 515). Dr. O'Connell diagnosed Plaintiff's back condition as "Postlaminectomy syndrome L4-L5, L5-S1 [and] Failed back syndrome with chronic pain syndrome." (Tr. 517). She explained her opinions as follows:

> This patient have been continually and appropriately treated for all of the above conditions without resolve. Because of this, the patient's prognosis is poor. It is well documented in his medical records that Mr. Hill has been suffering from severe unrelenting pain which has not been resolved by aggressive medical and surgical management. My direct observation and physical examination of the patient demonstrates that his pain is credible and noted to be in appropriate distributions for his known pathology. His neurologic findings also corroborate his pain post laminectomy. Unfortunately, he has formed scar tissue, which is well documented on multiple MRIs and CT scans. There has been degradation of the disk space areas from microdiscketomies, which when coupled with osteoarthritic spondylosis have produced chronic pain syndrome. It is my medical opinion based on history, physical exam and review of the medical record, that Mr. Hill is suffering from a disability that prevents him from engaging in gainful employment. This disability began 06/12/2000 and is expected to last the rest of his life.

(Tr. 518).

In February 2004 Dr. Wunder examined Plaintiff for the Ohio Bureau of Disability Determinations. He opined that Plaintiff could lift a maximum of 10 pounds and that Plaintiff was limited to sitting or standing a maximum of 4 hours. (Tr. 658). These opinions were somewhat consistent with those of Drs. Keyes, Vitols, and O'Connell to the extent that Dr. Wunder's opinion about Plaintiff's limited standing and sitting abilities was tantamount to finding that he was able to do less than sedentary work. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184 at *2 ("Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.... A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Has the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity,[3] can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## IV.    ALJ SHELL'S DECISION

The decision at issue in the present case was issued by ALJ Shell in April 2008. (Tr. 707-32).  ALJ Shell conducted the required five-step sequential evaluation as follows:

Step 1:      Plaintiff had not engaged in any substantial gainful activities during the relevant time period – June 12, 2000 through December 31, 2005.

Step 2:      Plaintiff suffered from the severe impairment of residual effects of a vertebrogenic disorder and corrective surgery (post-laminectomy syndrome).  Plaintiff did not suffer from severe mental impairment before his date last insured because the evidence failed to show that his depression persisted at a severe level for at least 12 months, especially through December 31, 2005.

Step 3:      Plaintiff did not have an impairment or combination of impairment that met or equaled the criteria of the Listings during the relevant time period.

Step 4:      The ALJ explained:

After careful consideration of the entire record, it is found that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work ... subject to the following limitations: no repetitive twisting; no exposure to vibration; no climbing of ladders, ropes, or scaffolding; only occasional climbing of stairs or ramps; no

---

[3]  The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

exposure to hazardous instrumentalities or situations; no exposure to high levels of humidity or to temperature extremes (lower than 20 degrees or higher than 75 degrees Fahrenheit); the opportunity to alternate between sitting and standing at will for a total of five minutes per hour; and bending with the hips locked at a 45-degree angle.

Step 4:      Plaintiff was unable to perform his past relevant work during the relevant time period.

Step 5:      Plaintiff could perform a significant number of jobs existing in the national economy.

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and was not eligible for DIB.  (Tr. 707-32).

## V.    JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative record supports the ALJ's factual findings.  *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance...'"  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo*.  *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994).  An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence.  *Rogers*, 486 F.3d at 241;

*see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id.* For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id.* (and cases cited therein).

## VI.  DISCUSSION

### A.  The Parties' Contentions

Plaintiff raises three main assertions:

1.  Plaintiff is limited to sustain a limited range of sedentary work for more than 4 to 5 hours a day, as evidenced by the opinions of his treating physician, Drs. Keyes, which was consistent with the opinions of the examining physicians, and was inconsistent solely with the opinions of Dr. Hutson, the record-reviewer who testified during the ALJ's October 2004 hearing.

2.  The ALJ failed to find a severe mental impairment despite this Court's previous assessment and substantial contrary evidence.

3.  Plaintiff's experience of pain is reasonably expected given his objective medical findings and the opinions of treating physician Dr. Keyes and the examining medical sources.

The Commissioner argues that the ALJ did not commit reversible error at Step 2 of the sequential evaluation because he found a severe physical impairment, and he continued the sequential evaluation as required by considering Plaintiff's severe and non-severe impairments in the remaining Steps of his evaluation.

The Commissioner further maintains that the ALJ did not err when evaluating the medical source opinions because the "ALJ's decision ... shows that he offered a basis for

13

how he resolved the evidentiary conflicts." (Doc. #14 at 7). In doing so, the Commissioner quotes parenthetically the following conclusion in *Bass v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007): "*Wilson* requires reversal when a treating physician's opinion was ignored and no reasons for doing so were provided.... That is not the case we have here."

The Commissioner also contends that the ALJ properly weighed the opinions of Dr. Keyes and properly relied on the opinions of Dr. Hutson to support his assessment of Plaintiff's Residual Functional Capacity.

Lastly, the Commissioner asserts that substantial evidence supports the ALJ's finding at Step 5 of the sequential evaluation.

## B.      Medical Source Opinions

### 1.
### Treating Medical Sources

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. §404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations...." 20 C.F.R. §404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* §404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] ... or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.....

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.


**2.**

**Non-Treating Medical Sources**

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical

opinions in your case record together with the rest of the relevant evidence we receive."
20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate
non-treating medical source opinions under the factors set forth in §404.1527(d)
including, at a minium, the factors of supportability, consistency, and specialization. *See*
20 C.F.R. §404.1572(f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3.

C. <u>Analysis</u>

The ALJ correctly recited the legal criteria applicable to determining whether a
treating medical source opinion was entitled to controlling weight, *see* Tr. 717, and in
doing so, the ALJ did not err as a matter of law, *see* 20 C.F.R. §404.1527(d)(2). The ALJ
also applied this legal criteria to Dr. Keyes' opinion. *See* Tr. 717. Yet, at this point in his
analysis, the ALJ wholly rejected Dr. Keyes' opinion without separately describing the
need to continue weighing Dr. Keyes' opinions under the remaining regulatory factors.
*See id*; *see also* 20 C.F.R. §404.1527(d)(2)-(6); *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d
at 544. And the ALJ did not separately describe the regulatory factors – i.e., the legal
criteria – applicable under the Regulations to the evaluation of the non-treating medical
source opinions. *See* Tr. 713-30. While these omissions do not automatically mean that
the ALJ failed to apply the correct legal criteria, the omissions requires the Court to
scrutinize the ALJ's decision to determine (1) whether he evaluated Dr. Keyes' opinion
under the remaining factors, as mandated by the Regulations; and (2) whether he
evaluated the non-treating medical sources under those regulatory factors.

Doing so reveals a somewhat conclusory and haphazard analysis by the ALJ.
Conclusory, for example, where the ALJ wrote, "The findings of some other medical
sources do not support a conclusion that the claimant is rendered disabled from all gainful
employment. That conclusion is rejected when evaluated under the guidelines of 20 CFR
404.1527." (Tr. 717). Haphazard, for instance, where the ALJ seemed to consider at
least one factor, consistency, when mentioning Dr. O'Connell's opinions, but mentioned
no regulatory factor when fully crediting Dr. Hutson's opinions.

The ALJ, moreover, appeared to reject Dr. Vitols' opinion that Plaintiff was unemployable for the sole reason that this question is reserved to the Commissioner under applicable law. *See* Tr. 717 and n.51. While the ALJ was correct to observe that the Regulations place the duty on the ALJ and the Commissioner to ultimately determine whether Plaintiff was under a "disability" within the meaning of the Social Security Act, *see* 20 C.F.R. §404.1527(e), nothing in the Regulations permitted the ALJ to discard Dr. Vitols's opinions for the sole reason that he expressed a disability opinion. Instead, as discussed above, *supra*, §VI(B)(2), the Regulations required the ALJ to evaluate Dr. Vitols' opinion under the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §§404.1572(d)(3)(5), (f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3. Such an evaluation was particularly necessary because Dr. Vitols provided a detailed report containing a cogent explanation of his opinions relying not only on his review of the medical record, but also relying on his examination findings and the results of objective testing, such as the post-surgical MRI Plaintiff underwent in 2000. *See* Tr. 324-33. The ALJ therefore erred as a matter of law by not applying the correct legal criteria to Dr. Vitols' opinions. *See* Tr. 715-19.

Perhaps even more significantly, the ALJ's reasons for rejecting treating physician Keyes' opinions are not supported by substantial evidence. The ALJ declined to apply controlling weight to Dr. Keyes' opinion that Plaintiff could not perform even sedentary work. In doing so the ALJ reasoned, in part, that Dr. Keyes' opinion was not well supported by medically acceptable clinical or diagnosed criteria. (Tr. 717). Substantial evidence does not support his reason, as shown in even a cursory review of Dr. Keyes' opinions. Dr. Keyes explained his October 2000 opinions by citing to a February 1999 MRI and to CT scans showing abnormal L4-L5 intra-vertebral disc, generalized bulging and compound herniation. (Tr. 222). Dr. Keyes based his September 2001 opinion on Plaintiff's September 5, 2001 lumbar MRI, which showed facet overgrowth and foraminal narrowing at the lower two lumbar levels. (Tr. 268-72). In a September 2003 letter, Dr.

Keyes noted that Plaintiff's "CAT scan shows scar tissue and foraminal narrowing...." (Tr. 519). Dr. Keyes also found that Plaintiff had a tenderness in his low back and decreased range of low-back motion. (Tr. 520).

In addition, the ALJ accepted Dr. Hutson's testimony without applying any of the factors mandated by the Regulations. Instead, the ALJ merely wrote, "All factors have been considered in weighing all of the evidence." (Tr. 719). The Regulations, however, required the ALJ to explain his consideration of these factors. This appears in the following:

> Unless the treating source's opinion is given controlling weight, the administrative law judge <u>must explain</u> in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any other opinions from treating sources, nontreating sources, and other nonexamining sources who do no work for us.

20 C.F.R. §404.1527(f)(2)(ii) (emphasis added). The ALJ did not mention a single regulatory factor when completely crediting Dr. Hutson's opinions. *See* Tr. 719. Given this, the ALJ's conclusory assurance that he considered all the factors when weighing all the evidence, *see id.*, does not comply with the mandatory procedural requirement set forth in §404.1527(f)(2)(ii). As explained in the Commissioner's Rulings:

> The Regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

> For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Councils levels that was not before the State agency, the

consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other facts that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Social Security Ruling 96-6p at Policy Interpretation. In the present case, because the ALJ did not explain why he fully credited Dr. Hutson's opinion, his decision failed to comply with the Regulations. *See id*; *see also* 20 C.F.R. §404.1527(f)(2)(ii).

Returning to the ALJ's rejection of Dr. Keyes' opinions, the ALJ drew a distinction between Dr. Keyes' earlier opinion, while noting "claimant's capacity for sitting, standing, walking, and lifting is quite limited" did not go so far as to say 'that the claimant is rendered totally disabled from all work activity." (Tr. 714)(citing Tr. 216). The ALJ believed that Dr. Keyes' later reports, which he felt documented greater limitations, were simply based on "uncritical acceptance of the claimant's subjective complaints and allegations." (Tr. 714).

The ALJ's distinction between the reports of Dr. Keyes is not supported by substantial evidence. The primary difference between Dr. Keyes' earlier reports and his later reports is that in his earlier reports, he was not asked to discuss how long Plaintiff could sit, stand, or walk during an 8-hour workday. (Tr. 216, 222). In those reports, Dr. Keyes believed that Plaintiff could not do those work activities for more than 15 minutes at a time. *Id*. In his later reports, when specifically asked about those work activities during an 8-hour workday, Dr. Keyes opined that Plaintiff could not sit or stand/walk more than 1 hour during an 8-hour workday. (Tr. 269, 521, 674). No reasonable person could conclude that such different answers to different questions constitute an "inconsistency," and consequently, the ALJ's finding of an inconsistency was not supported by substantial evidence.

In addition, Dr. Keyes' opinions (Tr. 216, 219-23, 262-72, 519-24, 674) are consistent with the opinions provided in the detailed reports of Dr. O'Connell (Tr. 508-

12) and Dr. Vitols (Tr. 324-33). Indeed, with the exception of Dr. Hutson, whose opinion the ALJ failed to evaluate as mandated by the Regulations, the opinions of the medical sources of record (namely, Drs. Keyes, O'Connell, Vitols, and Wunder) were consistent on the point that Plaintiff was unable to perform even sedentary work for more than 4 or 5 hours per workday. Their opinions thus establish that Plaintiff was unable to perform work on a regular and continuing basis – that is, for 8 hours a day, 5 days a week. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184 at *2 ("Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.... A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

For the above reasons, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions of record and to the ALJ's assessment of his Residual Functional Capacity are well taken.[4]

### D.    Remand For Payment Of DIB Is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence

---

[4] In light of these conclusions, there is no need to address Plaintiff's other challenges to the ALJ's decision.

of disability is either overwhelming or strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. This is so in light of the consistent opinions provided by treating physician Dr. Keyes, examining physicians Drs. O'Connell and Vitols, and consulting examiner Dr. Wunder, while the only significant contrary opinion was provided by Dr. Hutson, a non-examining, non-treating record-examining physician. In addition, the record contains little medical evidence to dispute the credibility of Plaintiff's pain testimony, during the period in question, particularly where his treating physician Dr. Keyes' relied on objective medical evidence as well as his examination findings (e.g., reduced range of low lumbar motion, *see* Tr. 520) to support his opinions and his treatment of Plaintiff with pain narcotics, including Oxycontin and Vicodin. No physician of record questioned that treatment, including Dr. Hutson. In addition, no factual issues remain to be resolved in this case, especially since gathering current or future medical tests will not shed much light on Plaintiff's condition and work abilities or limitations during the relevant time period: June 12, 2000 and through December 31, 2005.

   Accordingly, the case should be remanded to the for payment of DIB.

## IT IS THEREFORE RECOMMENDED THAT:

1.   The Commissioner's non-disability finding be reversed;

2.   This matter be remanded to the Social Security Administration for the payment of benefits consistent with the Social Security Act beginning on June 12, 2000 and through December 31, 2005; and

3.   The case be terminated on the docket of this Court.

July 17, 2009

   <u>      s/ Sharon L. Ovington         </u>
                    Sharon L. Ovington
                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).